IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | CASE NUMBER 1:22-CR-00071-1-TH |
| v. | § | |
| | § | |
| | § | |
| MARCO TULIO CANTE SALAZAR | § | |
| | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE ON THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Pending before the undersigned is a "Motion to Suppress" (Doc. #26) filed by the Defendant, Marco Tulio Cante Salazar ("Salazar").[1]   The United States filed a response to the Defendant's motion (Doc. #32), and the undersigned magistrate judge heard testimony and oral argument on November 28, 2022.  The undersigned finds that the traffic stop was unlawful, and therefore the search and seizure were unlawful.  Accordingly, the undersigned recommends granting Salazar's Motion to Suppress.

## I. RELEVANT FACTS

During the hearing, Officer Matthew Balsizer, who works patrol with the Beaumont Police Department, testified that prior to his shift on July 18, 2022, he received a Facebook chat message from "ER Ka" that there would be a grey Toyota Matrix with a Georgia license plate traveling on Interstate 10 towards Georgia with "3 keys of meth."  (Govt. Ex. 2.)  Officer Balsizer stated that "ER Ka" was part of a Facebook social group designated for instructors and police officers that worked roadside interdiction where officers can share information.  He testified that this group

---

[1] This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law.  *United States v. Raddatz*, 447 U.S. 667, 681-84 (1980); *see also* 28 U.S.C. § 636(b)(1)(B) and E.D. TEX. LOCAL R. CR-59(a).

was not affiliated with the Beaumont Police Department.  According to Officer Balsizer, "ER Ka"

identified himself as an officer with the Chambers County Sheriff's office.  (*Id.*)  He also sent a

photo of the vehicle to Officer Balsizer.  (*Id.*)

Later that evening, while working his patrol shift, Officer Balsizer set up on I-10 near

Laurel facing Eastbound to conduct surveillance for the grey Toyota Matrix.  At approximately

11:00 p.m., he saw this vehicle pass by him and pulled his patrol car onto the interstate to follow

it.  The Toyota Matrix had the same license plate number as the photo Officer Balsizer received

on Facebook, and was being driven by Salazar.  Officer Balsizer stated that Salazar was traveling

in the third lane of the four-lane highway and made a signaled lane change to the left into the

second lane over a solid white line at the gore point of a divided highway that split into I-10 on the

left and Highway 69 on the right.

Salazar continued to drive on I-10 until Officer Balsizer activated his lights and they both

exited the interstate at the Seventh Street exit.  Once stopped, Officer Balsizer asked Salazar for

his information and discovered that he only spoke Spanish.  He then called Officer Rodriguez to

the scene to speak with Salazar in Spanish.  Officer Balsizer testified that Salazar had no driver's

license[1] or proof of insurance.  Salazar gave the officers consent to search the vehicle, and they

found two kilograms of methamphetamine and one-half of a kilogram of cocaine in the trunk.  The

Government produced a copy of Officer Balsizer's dash camera footage showing the Matrix

vehicle driven by Salazar traveling along the interstate and the subsequent stop as Exhibit 1.

As a result of this search and seizure, Salazar was initially charged in a Complaint and then

later indicted on September 7, 2022, in a two-count Indictment with possession with intent to

---

[1] Contrary to Officer Balsizer's testimony, the affidavit signed by Task Force Officer John Guerra attached to the Complaint in this case states that Salazar possessed a Guatemalan Consular ID Card and an international driver's license.  (Doc. #3-1.)  Texas recognizes driving privilege reciprocity, including the country of Guatemala.  *See* https://www.dps.texas.gov/section/driver-license/driving-privilege-reciprocity (last visited Nov. 29, 2022).

distribute methamphetamine and possession with intent to distribute cocaine, both in violation of

21 U.S.C. § 841. (Doc. #17.)

In Salazar's motion, he asks the court to suppress all of the evidence seized as a result of

the violation of his rights under the Fourth Amendment of the United States Constitution. (Doc.

#26.) Specifically, Salazar argues the traffic stop was an unreasonable seizure because it was not

based upon a reasonable suspicion that he committed a traffic violation, nor was there reasonable

suspicion that criminal activity was afoot. In response, the Government contends that the stop was

justified at its inception based upon Officer Balsizer's reasonable suspicion that Salazar was

transporting methamphetamine. (Doc. #32.) In addition, it claims the stop was justified when

Officer Balsizer observed Salazar commit traffic violations pursuant to Texas Transportation Code

§§ 545.060 and 545.063 by traveling over the solid white lines of the gore point separating I-10

and Highway 69. (*Id.*)

## II. <u>RELEVANT LAW AND DISCUSSION</u>

The Fourth Amendment protects individuals from unreasonable searches and seizures.

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v.*

*Prouse*, 440 U.S. 648, 653 (1979). Because traffic stops are considered more similar to

investigative detentions than formal arrests, the legality of traffic stops for Fourth Amendment

purposes is analyzed under the standard articulated in *Terry v. Ohio,* 392 U.S. 1 (1968). *Terry*

requires that courts apply a two-step "reasonable suspicion" inquiry to: 1) determine whether the

officer's action was justified at its inception, and 2) determine whether the search or seizure was

reasonably related in scope to the circumstances that justified the stop in the first place. *United*

*States v. Zamora*, 661 F.3d 200, 204 (5th Cir. 2011). Where there is no warrant, the government

bears the burden of establishing by a preponderance of the evidence that the challenged search and/or seizure was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have objectively reasonable suspicion that criminal activity is afoot. *United States v. Martinez,* 486 F.3d 855, 859 (5th Cir. 2007). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *See, e.g., United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvizu*, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S. at 27.

In the alternative, the officer must have probable cause[2] that the motorist has committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 812 (1996). However, the legal justification for the stop must be objectively grounded. *United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999). If the supposed traffic violation that formed the basis for a stop was in fact not a violation of state law, there is no objective basis for probable cause justifying the stop. *United States v. Miller,* 146 F.3d 274, 279 (5th Cir. 1998). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are

---

[2] There is some inconsistency in case law as to whether there must be reasonable suspicion as opposed to probable cause that a traffic violation occurred; however, the Fifth Circuit has stated that both of these standards result in the same requirement—a traffic law violation must actually occur. *See United States v. Raney*, 633 F.3d 385, 392 (5th Cir. 2011) ("Because an officer's reasonable suspicion that a traffic violation occurred requires the same objective basis as probable cause for a traffic stop, i.e., that a traffic law was actually violated, we need not undertake a separate analysis.").

sufficient for a reasonable person to conclude that the suspect had committed, or was in the process

of committing, an offense." *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999).

"The judge's role at a suppression hearing is to determine the credibility of witnesses and

find the facts." *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016). "At a

suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and make

credibility determinations regarding conflicting testimony." *Id.*; *see Norman v. Stephens*, No.

CIV.A. H-13-0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013).

### A.    Traffic Violations

*1.    Texas Transportation Code § 545.060 – Driving on a roadway laned for traffic*

Section 545.060 of the Texas Transportation Code states that

> (a) An operator on a roadway divided into two or more clearly marked lanes for traffic:
> (1) shall drive as nearly as practical entirely within a single lane; and
> (2) may not move from the lane *unless that movement can be made safely.*
> (b) If a roadway is divided into three lanes and provides for two-way movement of traffic, an operator on the roadway may not drive in the center lane except:
> (1) if passing another vehicle and the center lane is clear of traffic within a safe distance;
> (2) in preparing to make a left turn; or
> (3) where the center lane is designated by an official traffic-control device for movement in the direction in which the operator is moving.
> (c) Without regard to the center of the roadway, an official traffic-control device may be erected directing slow-moving traffic to use a designated lane or designating lanes to be used by traffic moving in a particular direction.
> (d) Official traffic-control devices prohibiting the changing of lanes on sections of roadway may be installed.

TEX. TRANSP. CODE § 545.060 (emphasis added).  As noted in this statute, a violation for failure

to maintain a single lane requires that a driver's deviation from a lane be made in an unsafe manner.

*Id.*; *see also Wall v. State,* No. 02-13-00552-CR, 2015 WL 2169307, at *3 (Tex. App.—Fort Worth

May 7, 2015, pet. ref'd).  The Government argues that Officer Balsizer observed Salazar commit

this traffic violation while following him.  Officer Balsizer testified that Salazar's lane change was

made unsafely because it was made in a gore point that often contains roadside debris and has a

concrete divider (at the inner most area of the gore).

Salazar argues that this lane change was made safely because he did not swerve or cause

other vehicles to brake or come close to striking any other vehicles. He cites to the *Fowler* case

for support. In *Fowler*, the defendant was stopped for a violation of this same statute. *Fowler v.*

*State*, 266 S.W.3d 498, 504 (Tex. App.—Fort Worth 2008, pet. ref'd). The court held that there

was no evidence that the defendant's failure to drive in a single lane was unsafe. *Id.* The officer

stated that two of the defendant's tires drifted into an adjacent same-direction lane one time and

by no more than a tire's width; there was no other vehicle in the next lane; and the movement of

defendant's truck was not unsafe or dangerous. *Id.* The court found that another factor must be

present to make the action unsafe, such as weaving for an extended period of time or repeatedly

crossing into a lane of oncoming traffic. *Id.*

The dash cam video produced by the Government shows Salazar using his blinker to signal

a left lane change then crossing over a solid white line from the right inside lane to the left inside

lane just prior to the chevron markings in the gore area. (Ex. 1.) Given the distance between

Salazar and Officer Balsizer's vehicle, it is unclear whether Salazar's front tires touched any of

the chevron markings in the gore area. The video does not show any visible debris in the gore

area, and there was no threat of Salazar hitting the concrete divider in the gore area. Officer

Balsizer did not testify to the contrary. He only testified as to theoretical dangers that could have

made this lane change unsafe *if* they were present. The solid white line is an indication of an exit

ramp at this location of the interstate and highway. As indicated in Salazar's motion, crossing a

solid white line is not a *per se* traffic violation. The court finds that there was no evidence

presented that Salazar's lane change was made unsafely.  The government did not meet its burden

in proving this traffic violation occurred giving justification for the stop in this case.

2.       *Texas Transportation Code § 545.063 – Driving on a divided highway*

The Government also alleges that Salazar violated section 545.063 of the Transportation

Code by crossing over the gore point dividing I-10 and Highway 69.  Section 545.063 states:

> (a) On a highway having two or more roadways separated by a space, physical
> barrier, or clearly indicated dividing section constructed to impede vehicular traffic,
> an operator shall drive on the right roadway unless directed or permitted to use
> another roadway by an official traffic-control device or police officer.
> (b) An operator may not drive over, across, or in a dividing space, physical barrier,
> or section constructed to impede vehicular traffic except:
> (1) through an opening in the physical barrier or dividing section or space; or
> (2) at a crossover or intersection established by a public authority.

TEX. TRANSP. CODE § 545.063.  Some examples of violations of this statute include: crossing over

a grass median (*Block v. State*, No. 05-16-00564-CR, 2017 WL 2118784, at *3 (Tex. App.—Dallas

May 16, 2017, no pet.); crossing solid yellow lines in the center of a highway (*Boggus v. Miller*,

388 S.W.2d 240, 242 (Tex. Civ. App.—Fort Worth 1965, writ ref'd n.r.e.); crossing double yellow

lines (*State v. Zubiate*, No. 08-19-00215-CR, 2020 WL 5105805, at *6 (Tex. App.—El Paso Aug.

31, 2020, no pet.); and driving over a curb, which is considered a physical barrier designed to

impede vehicular traffic (*Hadley v. State*, 223 S.W.3d 421, 423 (Tex. App.—Amarillo 2006, pet.

ref'd).

The Government contends the chevron marked gore area is a "dividing space" that drivers

are prohibited from driving over, across or within.  There is no qualifier in this section of the

transportation code if the movement is done "safely" like the previous section discussed—if driven

over, across or within, it is an illegal movement other than at specific "openings."  The evidence

is unclear as to whether Salazar actually crossed over the gore area or only the solid white line

7

prior to the gore area.  The Government argues that he crossed the gore area; however, the dash cam video only shows Salazar crossing the solid white line prior to that area.

The court could not find any caselaw discussing a gore area within the context of this section of the transportation code.  However, as discussed by defense counsel in Salazar's motion, the Texas Manual on Uniform Traffic Control Devices discusses gore areas and the use of solid white lines in conjunction with them.  It states, "[w]here crossing the lane line markings is discouraged, the lane line markings shall consist of a normal or wide solid white line. . . Where it is intended to discourage lane changing on the approach to an exit ramp, a wide solid white lane line may extend upstream from the theoretical gore or, for multi-lane exits, as shown in Drawing B of Figure 3B-10, for a distance that is determined by engineering judgment."  TEXAS MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES, Section 3B.09, p. 384 (2011 Ed., 2nd Revision October 2014).  Thus, the manual makes clear that crossing the solid white line at a gore area is "discouraged" but not prohibited.  This manual is issued under the authority of Chapter 544 of the Texas Transportation Code and is commonly relied upon by courts.  *See Abney v. State*, 394 S.W.3d 542, 549 (Tex. Crim. App. 2013); *Rickels v. State*, 202 S.W.3d 759, 760 n.1 (Tex. Crim. App. 2006).

Given the language used in this manual under the authority of the Transportation Code, it would be contradictory for the state of Texas to simultaneously strictly prohibit that same action in another section of the transportation code as alleged by the Government.  The court will not interpret the statute in such a way.  The court finds that the Government did not meet its burden in proving this traffic violation occurred giving justification for the stop in this case.

**B.**      **Reasonable Suspicion Based Upon Facebook Chat with "ER Ka"**

The collective knowledge doctrine permits a stop at the direction of, or based on information relayed from, another law enforcement agency. *See United States v. Hensley*, 469 U.S. 221, 232–33 (1985). This doctrine applies "so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). "Officers may conduct an investigatory stop in reliance on information *issued through police channels*, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on articulable facts supporting a reasonable suspicion that the wanted person has committed an offense." *United States v. Alvarez*, 40 F.4th 339, 351– 52 (5th Cir. 2022) (emphasis added) (citing *Hensley*, 469 U.S. at 232.); *see also* 22 C.J.S. Criminal Procedure and Rights of Accused § 78 (stating that the information received must be through "official channels" in order the collective knowledge to form the basis upon which the police may establish reasonable suspicion or probable cause); *see United States v. Gonzalez*, 121 F. Supp. 3d 1094, 1173 (D.N.M. 2015) ("So long as agents and officers use reliable channels to communicate their instructions to other officers, and those instructions accurately reach those officers, the collective knowledge doctrine allows courts to impute the directing officers' probable cause to the officers in the field."); *see Nesby v. City of Oakland*, No. C05-3555JL, 2007 WL 831765, at *17 (N.D. Cal. Mar. 19, 2007) ("Officers in the field do not violate the Constitution by relying on process and orders apparently valid on their face (*Whirl v. Kern*, 407 F.2d 781, 790 (5th Cir. 1968) or by relying on information received through official channels."). Reasonable suspicion exists when an officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

However, courts have warned that this doctrine is not an end run around *Terry v. Ohio*—the officer or agency relaying the information must have reasonable suspicion to justify the stop. *Hensley*, 469 U.S. at 232. "Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008). Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience. *United States v. Alvarez*, 40 F.4th 339, 345–46 (5th Cir. 2022). If the information "has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id.* (quoting *Hensley*, 469 U.S. at 232); *see also Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").

As briefly discussed above, the Government alleges that Officer Balsizer had reasonable suspicion that criminal activity was afoot justifying the stop of Salazar due to information received from another officer. Specifically, they allege that the Facebook chat from "ER Ka" stating that the grey Toyota Matrix with the identified license plate was transporting methamphetamine provided a basis for the traffic stop in this case.

The glaring problems with this relay of information are not only that it was received through Facebook messenger, which is an unofficial police channel, but also that there was absolutely no evidence presented showing that "Er Ka" had reasonable suspicion. The Government did not call Ethan Kahla to testify and presented no evidence showing the basis of the information he relayed. As a result, the evidence presented has no more indicia of reliability than an anonymous tip.

Officer Balsizer testified that he and "ER Ka" were both members of a Facebook social group that included police officers and instructors and the purpose was to share information on interdiction efforts.  He stated this group was not affiliated with a police department.  He also did not know how it vetted members, other than he was required to provide his police officer email address upon joining and the group was supposed to call and verify each member's employer, but he did not know if that call was ever made.

On the night of the traffic stop at issue, Officer Balsizer received a chat message on Facebook messenger from "ER Ka."  The Government provided a copy of the chat thread as Exhibit 2 at the suppression hearing.  The only other identifying information on this thread is a photo of a child next to the username, "ER Ka."  According to the chat thread, "ER Ka" told Officer Balsizer that there would be a car coming out of Liberty taking 90 then I-10 to Georgia with 3 keys of meth.  He also provided a photo of the vehicle with the license plate number.  Officer Balsizer testified that he thought this photo looked like an "LPR" or license plate reader, which is a database used by officers, tow truck companies, and those who do repossessions of vehicles.

"ER Ka" told Officer Balsizer that he worked for "Chambers."  No information was communicated about who was driving the vehicle.  Officer Balsizer did not independently look up the vehicle at issue and did not know if it was on a "hot list" for suspected vehicles.  Officer Balsizer did not verify any information prior to the traffic stop.  He testified that he did not know the source of the information received from "ER Ka" and still does not know to this day the source of the information.

Officer Balsizer testified that he looked up this person on the Chambers County Sheriff's office website or Facebook page and verified that it was Ethan Kahla, who is a deputy.  There was no evidence of whether Officer Balsizer verified this information prior to or after the traffic stop.

Officer Ethan Kahla did not testify at the suppression hearing.  No evidence was provided by the Government linking the profile belonging to "ER Ka" to a verified police officer.  The name, Ethan Kahla, does not appear anywhere in the chat thread marked as Government's Exhibit 2.  Officer Balsizer indicated that he verified "ER Ka" using an email address contained in the chat thread; however, no email address is visible anywhere in the chat thread provided to the court.  It is still unclear to the court how exactly Officer Balsizer verified that "ER Ka" is Officer Ethan Kahla.

Additionally, this information exchange was not done through official police channels and on that basis alone, the court finds that the collective knowledge doctrine should not apply.  The court is not convinced that "ER Ka" was acting in an official capacity or that he is even a police officer.  However, even putting that issue aside, "ER Ka" or Officer Ethan Kahla must have reasonable suspicion justifying the stop in this case in order for Officer Balsizer to properly rely on the information passed on.  The Government did not present any evidence on this issue.  The court finds this is fatal to the Government's claim of reasonable suspicion.

For example, in *Alvarez,* the arresting officer relied upon information received in a round-up packet.  *United States v. Alvarez*, 40 F.4th 339, 352 (5th Cir. 2022).  Therefore, the officer who issued the packet was required to have reasonable suspicion justifying a stop.  *Id.*  However, the court noted that the arresting officer did not know who provided the information in the packet, and the government did not introduce into evidence any details about the origin or timeliness of the information therein to show that it was premised on articulable facts.  *Id.*  The court stated, "[w]e do not blindly accept officers' reliance on information obtained through police channels; the government must substantiate the basis of the information."  *Id.*  Consequently, the Fifth Circuit held that the government failed to establish reasonable suspicion that could have been transferred between officers and the collective knowledge doctrine did not apply.  *Id.*

Here, the court finds that the Government failed to substantiate the basis of the information received by Officer Balsizer, and therefore there was no reasonable suspicion to support the traffic stop of Salazar.

At best, based upon the evidence presented to the court, the information received by Officer Balsizer was an anonymous tip, which can, in certain circumstances, provide the reasonable suspicion necessary to justify an investigatory stop. *Alabama v. White*, 496 U.S. 325, 327–29 (1990). Whether a particular tip provides a sufficient basis for an investigatory stop depends upon the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity or has instead gone stale. *Id.* at 328–32.

With regard to these factors, at the time of the traffic stop, Officer Balsizer did not know how credible or reliable "ER Ka" was. It is unclear when or how he verified "ER Ka's" actual name and profession. *See United States v. Wali*, 811 F. Supp. 2d 1276, 1284 (N.D. Tex. 2011) ("after-acquired evidence or information cannot be used to establish reasonable suspicion for the initial stop"). This was also the first time that he had ever talked to "ER Ka" in any form of communication. He testified that he had never met him and had only communicated with him via messenger or text in this instance. The only specificity provided in the tip was the car's information and a photo of the vehicle. He testified that the LPR photo of the car was taken on July 11, 2022 (7 days prior to the traffic stop), which was indicated by the barely visible metadata for the photo. No information was provided about the owner of the vehicle, the driver of the vehicle, or the names of any suspects involved. As stated above, Officer Balsizer did not verify any information from the tip. He did not call the Chambers County Sherriff's Department to verify

the source of this information.  He also did not run the license plate number provided.  Last, the

tip seemed to indicate that it involved recent activity of the car driving through I-10 that night, but

the photo of the vehicle was at least a week old.  Consequently, the court finds that even if this

were considered an anonymous tip, the Government still failed in meeting their burden of showing

reasonable suspicion justifying the traffic stop of Salazar.

### C.      Suppression of Evidence

Under the fruit-of-the-poisonous tree doctrine, "all evidence derived from the exploitation

of an illegal search or seizure must be suppressed, unless the Government shows that there was a

break in the chain of events sufficient to refute the inference that the evidence was a product of a

Fourth Amendment violation."   *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

Therefore, the court must now consider whether the evidence discovered in the vehicle being

driven by Salazar was a "fruit" of the illegal stop, or whether there was some break in the chain

sufficient to rid the taint of that violation.

The Government asserts that Salazar consented to the search of the vehicle.  Even where

there is an unjustified *Terry* stop, "consent to search may, but does not necessarily, dissipate the

taint of a fourth amendment violation." *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th

Cir.1993).  Consent is valid if it was: 1) voluntary and 2) an "independent act of free will."  *United

States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).  "The first prong focuses on coercion, the

second on causal connection with the constitutional violation."  *Chavez–Villarreal*, 3 F.3d at 127.

The dash cam video (Exhibit 1) in this case shows Officer Balsizer's vehicle parked

directly behind Salazar's vehicle for the traffic stop.  Officer Balsizer first spoke with the passenger

of the vehicle then asked Salazar (the driver) to exit the vehicle a little over a minute after the stop

and had him place his arms on the hood of the patrol vehicle facing the dash cam. The passenger

remained in the vehicle. While Salazar stands at the patrol car with his arms and hands on the hood, there is a short discussion between the two while Officer Balsizer called dispatch to request a Spanish speaking officer. The only thing that can be heard on the video is the police radio. Salazar and Officer Balsizer's communications are inaudible. Despite the language barrier, the video shows them speaking until Officer Rodriguez's arrival, which appears to be about 13 minutes into the stop. Once Officer Rodriguez arrives and speaks with Salazar, the search of the vehicle begins approximately 22-23 minutes into the stop. It is unclear when consent to search the vehicle was given since there is no audio of Salazar and Rodriguez. At this point, Salazar and the passenger are no longer in the view of the camera. The trunk is searched first, and the bags of drugs are found under the trunk floorboard approximately 2-3 minutes into the search.

To determine voluntariness, the court considers: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Portillo-Aguirre*, 311 F.3d 647, 658 (5th Cir. 2002). The court notes that Salazar was cooperative with all of the officers' requests and remained with his arms and hands on the hood of the patrol vehicle for the entirety of the stop until the search started. If he tried to move, Officer Balsizer pointed for him to keep his arms and hands on the hood of the patrol vehicle. No evidence was presented as to Salazar's awareness of his rights (a women speaking Spanish can be heard reading him his *Miranda* rights on the video when he is in the patrol car after being arrested approximately 1 hour and 33 minutes into the video); nor is there any evidence of his education and intelligence, or his belief that no evidence would be found. In the video, Salazar appears mostly relaxed and cordial with Officer Balsizer. These

15

factors are not dispositive, however, as the court finds that the second prong is not met as discussed below.

For the second prong—to determine if consent was independent—this court looks to factors articulated by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). Those factors are: "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *United States v. Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015). The court finds this prong weighs in favor of Salazar. For the first factor of proximity, the time between the illegal stop and consent given was less than 25 minutes, and half of that time was spent waiting for a Spanish speaking officer to arrive. It cannot be determined exactly when consent was given. However, once Officer Rodriguez arrives, the search begins within ten minutes. *See Montgomery*, 777 F.3d at 273–74 ("There is, however, substantial authority for the proposition that consent given within a few seconds or minutes of the violation generally favors the defendant.").

As to the second factor—intervening circumstances—there was no evidence presented showing any intervening circumstances. Salazar was never told he was free to go; nor is there any indication that he believed he was free to go. He was stopped, held, questioned, and the search began. Finally, as to the purpose and flagrancy of the misconduct, there is no question that Officer Balsizer's intent was to search this vehicle even before he initiated the stop. *See United States v. Jaquez*, 421 F.3d 338, 342 (5th Cir. 2005) (finding third factor satisfied where "very purpose of her unlawful stop was to secure his consent to search the vehicle"); *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (government cannot claim that the consent was independent of the illegal stop when the stop was designed specifically to obtain that consent).

Consequently, the court finds that there was no break in the chain of events, and the evidence in this case seized from the traffic stop must be suppressed as fruit of the poisonous tree.

### D.    Inevitable Discovery Doctrine

The inevitable discovery doctrine allows for the admission of evidence that would have been lawfully discovered even without the unconstitutional source. *See Nix v. Williams*, 467 U.S. 431, 443–444 (1984).  It applies if "the Government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) that the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Walker*, 49 F.4th 903, 909 (5th Cir. 2022).

The Government argues that this doctrine applies here because Salazar did not have a driver's license or proof of insurance.  Officer Balsizer testified in court that Salazar had no driver's license or proof of insurance.  He also stated that the police department's policy is to arrest a driver when they don't have both items and impound their vehicle, which would include a lawful inventory search of the vehicle.  He testified that an inventory search would have led the police to inevitably discover the drugs hidden under the trunk floorboard.

In *Walker*, the Fifth Circuit examined this doctrine in the context of inventory search of a vehicle. *Walker*, 49 F.4th at 909.  In that case, Walker was pulled over for two traffic violations— making an illegal U-turn and erratic driving. *Id.* at 907.  The court found these violations gave the officer reasonable suspicion to stop Walker. *Id.*  After running his information, the officer discovered that Walker had outstanding traffic warrants, arrested him, and did a search of his vehicle. *Id.*  Although the warrants were later determined to be invalid, the court found that the inevitable discovery doctrine applied to the firearm found in the vehicle because the stop and arrest

17

were valid (based upon the good faith exception), so the evidence would have inevitably been found in a later inventory search of the vehicle upon impound. *Id.* at 909-910.

In this case, there was no valid stop for the reasons discussed above. Therefore, without that police misconduct, there can be no reasonable probability that this evidence would have been discovered by lawful means. In addition, there was no evidence presented that the Government was actively pursuing a substantial alternate line of investigation.

While Officer Balsizer testified repeatedly that Salazar did not have a valid driver's license, the complaint affidavit filed with this court for the arrest warrant for Salazar states that Salazar did in fact have an "international driver's license" in his possession at the time of the traffic stop. (Doc. #3-1.) The dash cam video also shows Officer Rodriguez place two identification cards on the hood of the patrol car at 33 minutes and 40 seconds into the video. At 47 minutes and 30 seconds, the video shows Officer Balsizer place the two identification cards in front of the Ziploc bags of drugs and take photos of them with his cellphone camera. Officer Balsizer's testimony that Salazar did not possess a driver's license is not credible, and no evidence was presented that Salazar's driver's license was invalid. Moreover, Salazar was not charged with the offenses of no driver's license or proof of insurance, nor was he arrested for those offenses.

As a result, the inevitable discovery doctrine does not apply. The evidence seized as a result of the traffic stop of Salazar should be suppressed.

### III. <u>RECOMMENDATION</u>

The undersigned finds that there was no reasonable suspicion to the stop Salazar's vehicle for traffic violations or suspicion of transporting drugs, and therefore the following search and seizure were also unlawful. Consequently, it is recommended that the district court grant the Defendant's Motion to Suppress. (Doc. #26.)

## IV. <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C), each party to this action has the right to file objections to this Report and Recommendation.  Objections to this Report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this Report, and (4) be no more than eight (8) pages in length.  *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(2); E.D. TEX. LOCAL R. CR-59(c). A party who objects to this Report is entitled to a *de novo* determination by the United States district judge of those proposed findings and recommendations to which a specific objection is timely made. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to *de novo* review by the United States district judge of the findings of fact and conclusions of law, *see Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States district judge, *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED this the 12th day of December, 2022.**

_____
Christine L Stetson
UNITED STATES MAGISTRATE JUDGE